UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM LIGHTNER,<br><br>    Plaintiff,<br><br> v.<br><br>BRENDA AUSMUS,<br><br>    Defendant. | Case No. 1:07-CV-294-EJL<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

  Pending before the Court are a Motion for Summary Judgment filed by Defendant Brenda Ausmus (Dkt. 54) and various other motions filed by the parties (Dkt. 53, 59, 62, 63, 65, 68, 69, 74, and 75). Having fully reviewed the record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court shall decide this matter on the written motions, briefs, and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order.

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**1. Standard of Law**

  Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

**MEMORANDUM DECISION AND ORDER - 1**

is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a motion for summary judgment, the moving party bears the "initial burden of identifying for the court those portions of the record which demonstrate the absence of any genuine issues of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986)). If the moving party points to portions of the record which demonstrate that there appears to be no genuine issue of material fact as to claims or defenses at issue, the burden of production shifts to the non-moving party. To meet its burden of production, the non-moving party "may not rest upon the mere allegations contained in his complaint, but he must set forth, by affidavits, exhibits or otherwise, specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56; *see T.W. Electric Serv., Inc.*, 809 F.2d at 630 (internal citation omitted).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. All inferences which can be drawn from the evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630-31 (internal citation omitted).

Generally, the Establishment Clause of the First Amendment is invoked by litigants asserting that the government is sponsoring religion, while the Free Exercise

**MEMORANDUM DECISION AND ORDER - 2**

Clause is implicated where the government is allegedly attempting to discourage a religion or practice. However, the line between these two Clauses is often blurred[1]. In *Everson v. Board of Education of Ewing Township*, 330 U.S. 1 (1947), the United States Supreme Court defined the reach of the First Amendment Establishment Clause as follows:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.

*Id*. at 15-16. State action violates the Establishment Clause if its primary effect is to advance or inhibit religion. *Gray v. Johnson*, 436 F.Supp. 2d 795 (W.D. Va. 2006) (citing *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 337 (1987)).

The Free Exercise of Religion Clause of the First Amendment absolutely protects the right to believe in a religion; it does not absolutely protect all conduct associated with a religion. *Cantwell v. Connecticut*, 310 U.S. 296 (1940)**.** Citizens clearly retain their free exercise of religion rights while in state custody. *O'Lone v. Estate of Shabazz*, 482 U.S.

---

[1] *See* Ronald J. Krotoszynski, Jr., *If Judges Were Angels: Religious Equality, Free Exercise, and the (Underappreciated) Merits of Smith*, 102 NW. U. L. Rev. 1189 (2008); Carolyn A. Deverich, *Establishment Clause Jurisprudence and the Free Exercise Dilemma: A Structural Unitary-Accommodationist Argument for the Constitutionality of God in the Public Square*, 2006 BYU L. Rev. 211 ("courts have also disagreed whether the Establishment and Free Exercise Clauses are interrelated or mutually exclusive, at times treating the Religion Clauses as different sides of the same coin ("unification")).

**MEMORANDUM DECISION AND ORDER - 3**

342, 348 (1987). Challenges to restrictions that are alleged "to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law." *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 125 (1977) (citation omitted).

An inmate cannot challenge revocation of parole in a civil rights action. *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (a prisoner in state custody cannot use a civil rights action to challenge the fact or duration of his confinement). The Supreme Court has made it clear that when a state prisoner seeks "a determination that he is entitled to immediate release or a speedier release from . . . imprisonment, his sole federal remedy is a writ of habeas corpus." *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973).

**2. Material Facts**

The following are either undisputed facts, or facts disputed by Defendant but taken in a light most favorable to Plaintiff.

Plaintiff was convicted of lewd conduct with a minor in 1994, and was subsequently designated a violent sexual predator (VSP) by the Sex Offender Classification Board. Plaintiff was paroled on January 24, 2004. He entered into a contract, agreeing to certain parole conditions in order to be released on parole. His parole conditions prohibited him from associating with a minor child under the age of 18 unless a responsible adult, approved by supervising personnel, is present. (Affidavit of Brenda

Ausmus, Exhibit E, Dkt. 54-3.)[2]

On May 18, 2004, under supervision of Senior Parole and Probation Officer (PPO) Moira Lynch, Plaintiff signed an addendum to the parole contract, indicating that he was to be allowed "the privilege" of attending LDS church meetings (LDS addendum). (I*d.*, Exhibit F.) Plaintiff now admits he desired to attend the LDS church a few times only because he did not agree with the doctrine, but he had received some charitable assistance from the church and its missionaries and wished to "allow them to complete their mission." (Affidavit of William Lightner, ¶ 17, Dkt. 58-1.) Lynch approved the addendum to attend the LDS church on May 25, 2004. (Ausmus Aff., ¶ 16 & Exhibit F, Dkt. 54-3.)

Defendant Brenda Ausmus became Plaintiff's parole officer on June 7, 2004. (*Id.*) Plaintiff later told Defendant Ausmus he wished to have an addendum to attend the Baptist church (Baptist addendum) instead of the LDS church. Defendant Ausmus explained the procedure necessary to obtain an addendum. Plaintiff declares that on or about August 12, 2004, the Baptist pastor, Robin Davies, signed the Baptist addendum the same day it was presented to him, as did Plaintiff's SANE therapist, Mark McCullough. (Affidavit of William Lightner, ¶¶ 22-25; Dkt. 58-1; Response, p. 14, Dkt. 58.) Plaintiff and Plaintiff's wife, Marcia Lightner, state that the Baptist addendum was

---

[2] The Court rejects Plaintiff's interpretation that his parole contract permitted him to attend "adult services" at a church without having permission from his parole officer. A church, by its nature, is a place frequented by children, and the parole contract prohibits him from associating with minor children without a responsible adult present who has been approved by supervising personnel. (Ausmus Aff., Exhibit D, Dkt. 54-3.)

**MEMORANDUM DECISION AND ORDER - 5**

left with Ausmus, and they understood it would not be approved and signed until Ausmus spoke to Pastor Davies. (Dkt. 58, p. 14; Affidavit of Marcia Lightner, ¶ 12, Dkt. 58-2.)

Five days after the Baptist addendum was submitted to Ausmus, Plaintiff was accused of violating parole and returned to prison. The Baptist addendum was either not approved by Ausmus, or it was later revoked by her. Plaintiff did not ever get to attend the Baptist church under the Baptist addendum.

When Plaintiff was released from prison after eight months of incarceration, he was returned to Defendant Ausmus' supervision on March 11, 2005. What happened next in Plaintiff's quest to attend the Baptist church is unclear from Plaintiff's filings. In some of his filings, Plaintiff states that, on April 12, 2005, Ausmus refused to sign or re-approve the same Baptist addendum that had been turned in eight months earlier (Response, p. 4, Dkt. 58); similarly, Plaintiff's wife's Affidavit states that on April 12, 2005, they went back to Ausmus' office to "pick up" the Baptist addendum. (Marcia Lightner Aff., ¶ 17, Dkt. 58-2.)

Elsewhere, Plaintiff contrarily states that he "took" a signed Baptist addendum to Ausmus and "submitted" it to her on April 12, 2005. (William Lightner Aff., ¶ 28 & ¶ 26, Dkt. 58-1.) This seems to suggest that there was a new Baptist addendum, or that Plaintiff had custody of the prior Baptism addendum and actually resubmitted it.

A third factual scenario Plaintiff poses is that "[w]hile it is true that Defendant denied Plaintiff's request for the Baptist church addendum in August 2004, it was not until 12 April 2005 when Defendant reinstated the LDS addendum." (Response, p. 6, Dkt.

**MEMORANDUM DECISION AND ORDER - 6**

58.) This suggests nothing at all was done with any Baptist addendum on April 12, 2005, but something was done with the prior LDS addendum.

A fourth factual scenario Plaintiff offers is that "[b]ecause Defendant reinstated the Internet addendum on 4-11-05 she also reinstated the LDS addendum on 4-12-05." (Response, p. 18, Dkt. 58.) This seems to say that Plaintiff is merely assuming that because something was done with an Internet addendum, something was also done with the prior LDS addendum.

A fifth slightly different allegation is that "[t]he fact is, the Defendant acted in a manner outside the scope of her job duties, when . . . she gave approval, then recanted her approval after the addendums were signed by all parties involved but defendant herself." (Plaintiff's Motion to Strike, p. 2, Dkt.37.)

In any event, all of Plaintiff's sets of allegations are aimed at showing that, on or about April 12, 2005, Defendant Ausmus denied Plaintiff's request to attend the Baptist church or told him he could attend only the LDS church. Plaintiff writes: "When Plaintiff stated he was not LDS and did not want to attend the LDS church, he was told that was the only addendum being approved, or would be approved." (Response, p.4, Dk. 58.) He also states: "The Defendant told the Plaintiff it did not matter what denomination he was. She would only allow him to attend an LDS[] church." (Amended Complaint, ¶ 20, Dkt. 57.) Plaintiff also alleges: "The Defendant wrote in her log that she was approving the addendum but with some changes. Those changes restricting the Plaintiff to attend only the LDS Church." (*Id*., ¶ 21.)

**MEMORANDUM DECISION AND ORDER - 7**

Plaintiff declares that Defendant Ausmus "would not sign the Baptist addendum, but Plaintiff continued to seek her approval until July 28, 2005." (Dkt. 58-1, ¶ 36.) On or about July 23, 2005, Plaintiff cut off his GPS ankle tracking device and fled to Belize with his wife. He was subsequently recaptured, his parole was revoked, and he was sent back to prison, where he now resides.

## 3. Defendant's Statute of Limitations Defense

### A. *Governing Law*

Inasmuch as the civil rights statute provides a remedy but does not itself confer any substantive rights, the statute of limitation period for filing a civil rights suit is the statute of limitation period for personal injuries in the state where the claim arose. *Wilson v. Garcia*, 471 U.S. 261 (1985). In Idaho, the statute of limitation for personal injuries is two years. Idaho Code § 5-219.

The Court uses federal law to determine when a claim accrues. *Elliott v. Union City*, 25 F.3d 800, 801-02 (9th Cir. 1994). The Ninth Circuit has determined that a claim accrues when the plaintiff knows, or should know, of the injury that is the basis of the cause of action. *See Fink v. Shedler*, 192 F.3d 911, 913 (9th Cir. 1999); *Kimes v. Stone*, 84 F.3d 1121, 1128 (9th Cir.1996). Under the "discovery rule," the statute begins to run once a plaintiff knows of his injury and its cause. *Gibson v. United States*, 781 F.2d 1334, 1344 (9th Cir. 1986). Under the discovery rule, a plaintiff "must be diligent in discovering the critical facts," or his claim will be barred if he "should have known in the exercise of due diligence." *Bibeau v. Pacific Northwest Research Foundation*, 188 F.3d

1105, 1108 (9th Cir. 1999).

Where a plaintiff alleges that several actionable events occurred, the court must determine whether the events are "discrete acts" and whether the remaining allegations are continuing "acts" or merely continuing "harm." The United States Supreme Court addressed this issue in *Delaware State College v. Ricks*, 449 U.S. 250 (1980). There, the college sent Mr. Ricks a letter denying him tenure, allowing him to work at the college for only one additional year past his present term. He continued to work at the college through the time allowed. He later filed suit, arguing that his statute of limitations began at the end of his term of employment, rather than the date he received notice that he was denied tenure.

The Supreme Court held that the statute ran from the date the plaintiff was notified of the decision to deny tenure. The Court emphasized that "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) (quoting *Ricks*, 449 U.S. at 258). Speaking of the similar circumstances in *Chardon* and *Ricks*, the *Chardon* Court noted that the statute of limitations was not extended because "there were no other allegations of illegal acts subsequent to the date on which the decisions to terminate were made." 454 U.S. at 8.

Similarly, in *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002), the issue was whether the statute of limitations ran from the date Defendants gave Plaintiff formal written notice of abatement of a public nuisance, or from the later date the

**MEMORANDUM DECISION AND ORDER - 9**

abatement hearing was held. There, the Court noted that "in determining when an act occurs for statute of limitations purposes, we look at when the 'operative decision' occurred, and [we] separate from the operative decisions those inevitable consequences that are not separately actionable.*" RK Ventures*, 307 F.3d at 1058 (citing *Chardon*, 454 U.S. at 8, and *Ricks*, 449 U.S. at 258).

The *RK Ventures* Court analyzed the statute of limitations issue as follows:

> We agree with the City that it "commenced" the abatement action on October 18, 1994, when the City police chief sent a letter to appellants and their counsel giving a formal Notice of Abatement of Public Nuisance, or on October 27, 1994, when the City Examiner's Office sent a letter to the City and appellants advising them of the commencement date and format of the administrative hearing. The City's decision to institute formal abatement hearings, and its notice to appellants of that decision, was the "operative decision" for the purposes of triggering the § 1983 statute of limitations. The actual beginning of the abatement hearing on November 14 was simply the effect of that decision and was not a separately unconstitutional act.

*Id*. at 1059. In addition, the *RK Ventures* Court observed: "The mere possibility that a decisionmaker might reverse a final decision, however, does not delay the commencement of the running of the statute of limitations." 307 F.3d at 1059 n.10 (citing *Ricks*, 449 U.S. at 260).

If more than one decision by defendants is at issue, the question is whether the later decision was "the inevitable consequence of an earlier decision," which will *not* trigger a new statute of limitations; or "the result of independent consideration," which *will* cause a new statute of limitations to begin. *Id.* at 1061; *see also The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690, 702 (9th Cir.

2009).

In *RK Ventures*, the City's later withdrawal of a settlement offer that was related to earlier issues was deemed a "discrete act" that was actionable and within the statute of limitations, even though the earlier acts were outside the statute. 307 F.3d at 1061. In *Committee*, a re-enactment of an agreement that had terms different from the first agreement and that required additional consideration rather than being an automatic renewal of a past action was deemed an actionable "discrete act." 583 F.3d at 702. Along the same line of reasoning, a defendant's mere refusal to rectify a past violation is not a discrete act that triggers a new statute of limitations. *Lewis v. Board of Trustees of Alabama State University*, 874 F.Supp. 1299, 1303 (M.D. Ala. 1995).

There exists a "continuing violations doctrine" that "permits a plaintiff to sue for all discriminatory acts that occurred during the limitations period, even if the policy or other event giving rise to the discrimination occurred outside the limitations period." *Committee*, 583 F.3d at 701. This doctrine requires a pattern or practice of discrimination. However, "discrete discriminatory acts will not create a pattern of discrimination without more; pattern-or-practice claims cannot be based on 'sporadic discriminatory acts' but rather must be based on 'discriminatory conduct that is widespread," *id.* (citations omitted), meaning "throughout a company" or a "regular part of the workplace." *Cherosky v. Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003). A "pattern or practice of discrimination" must be distinguished from "ongoing harm resulting from earlier discrete decisions." *Committee*, 583 F.3d at 702. The United States Court of Appeals for the Ninth

**MEMORANDUM DECISION AND ORDER - 11**

Circuit has observed: "The Supreme Court has made clear . . . that the application of the continuing violations doctrine should be the exception, rather than the rule." *Cherosky*, 330 F.3d at 1248.

The continuing violation theory has been considered in contexts other than employment cases. In *Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008),[3] the Ninth Circuit Court determined that once inmate Ngo received notice at a hearing that he would be barred from all special programs after being released from administrative segregation, and that the restriction was "indefinite," his 15-day time period for challenging the restriction within the prison administrative grievance system began to run. The *Ngo* Court rejected the argument that "the 15-day limitations period restart[ed] each day he [was] unable to participate in prison special programs." *Id*. at 1109.

In *Knox v. Davis*, 260 F.3d 1008, 1014 (9th Cir. 2001), the court rejected a continuing violation theory in a § 1983 case, where the prison had notified Attorney Knox by letter that all of her mail and visitation rights with all inmates were suspended, and the prison had subsequently enforced the suspension on different occasions. After Attorney Knox filed suit and the defendant raised a statute of limitations defense, the court held that each denial of Knox's visitation rights after the date of the original notification was "merely the continuing effect of the original suspension," not a new discrete act. *Id*. at 1013 (relying on *Ricks*).

A claimant may file a lawsuit beyond the statute of limitation deadline if he can

---

[3] This is the decision after remand from *Woodford v. Ngo*, 548 U.S. 81 (2006).

**MEMORANDUM DECISION AND ORDER - 12**

show that his statute of limitation should have been tolled (or stopped) for a certain period of time during the deadline period within which he should have filed the lawsuit. In a civil rights case such as this, state tolling provisions apply unless important federal policy will be undermined. *See Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 464–65 (1975).

B. *Analysis*

Plaintiff alleges that his First Amendment rights were violated on August 12, 2004, when Defendant Ausmus refused to sign or approve the addendum permitting him to attend Baptist church services. He alleges that the Baptist addendum was completely signed and ready for Ausmus' approval on August 12, 2004, but she did not sign it because of her alleged bias in favor of the LDS church. Accordingly, his cause of action accrued at that time. Therefore, any complaint should have been filed no later than August 12, 2006. Plaintiff's complaint in this action was filed on June 27, 2007 (mailbox rule date, if it applies) or July 5, 2007 (actual filing date), causing the claim to be untimely.

Plaintiff has not brought forward any evidence showing that equitable tolling or equitable estoppel should be applied to render his claim timely.[4] Therefore, Defendant

---

[4] The Idaho Supreme Court has determined that "[s]tatutes of limitation in Idaho are not tolled by judicial construction but rather by the expressed language of the statute." *Wilhelm v. Frampton*, 158 P.3d 310, 312 (Idaho 2007). Idaho statutorily tolls the limitations period for a person's minority status or insanity. I.C. § 5-230. Early filing of a case pending resolution of a previous case will not necessarily result in dismissal in Idaho, but rather a stay or injunction is available to preserve one's rights. *Wilhelm v. Frampton*, 158 P.3d at 312. The theory of equitable estoppel is also available. While it "does not 'extend' a statute of limitation," it works in a

**MEMORANDUM DECISION AND ORDER - 13**

Ausmus is entitled to summary judgment on this claim, and it is subject to dismissal with prejudice.

Plaintiff argues that, after he was briefly re-incarcerated and then released onto parole, a separate cause of action accrued when Ausmus again refused to permit him to attend the Baptist church on April 12, 2005 (whether by refusal to sign or re-approve the 2004 Baptist addendum, refusal to sign or approve a new Baptist addendum, reinstatement of the prior LDS addendum with refusal to permit Baptist church attendance, or recantation of approval of the Baptist addendum).

If Ausmus gave new consideration to her old decision on April 12, 2005 (such as the allegation that Ausmus took the position that because he was re-incarcerated, he had to start all over again to obtain all new addendums upon release), a new cause of action accrued on April 12, 2005, when Ausmus refused to allow Plaintiff to attend the Baptist church. Plaintiff alleges that on April 12, 2005, Ausmus made it clear that the only addendum she would sign would be an LDS addendum.

However, that date is still outside of the two-year statute of limitations period, because the Complaint was not filed until June 27, 2007 (mailbox rule date, if it applies) or July 5, 2007 (actual filing date), and it should have been filed no later than April 12, 2007. As a result, the claim is untimely.

---

similar manner to prevent a party who has falsely represented or concealed a material fact with actual or constructive knowledge of the truth "from pleading and utilizing the statute of limitations as a bar, although the time limit of the statue may have already run." *J.R. Simplot Co., v. Chemetics International, Inc*., 887 P.2d 1039, 1041 (Idaho 1994).

**MEMORANDUM DECISION AND ORDER - 14**

Plaintiff's statement that he continued to try to convince Ausmus to change her mind after April 12, 2005, does not signal the start of a new statute of limitations because the act was already completed on April 12, 2005. As noted above, a defendant's mere refusal to rectify a past violation is not a discrete act that triggers a new statute of limitations. *Lewis*, 874 F.Supp. at 1303.

Plaintiff has not brought forward any specific evidence showing that Ausmus performed a new act independent of the earlier denials that allegedly violated his First Amendment right to practice the Baptist religion between April 12, 2005, and June 27, 2005 (two years prior to the filing of the Complaint). He vaguely declares that he "worked hard while on parole to gain Defendant's approval to attend the Baptist church with no avail," and he "continued to secure an approval signature from her through 2004 until July 2005 when he absconded parole." However, there is insufficient evidence in the record to show that, between April 11, 2005, and June 27, 2005, Plaintiff took a different action that would have triggered Ausmus to act (such as submitting a new addendum) or that Ausmus took an action other than her alleged action of having denied Plaintiff the opportunity to attend the Baptist church and having permitted him to attend only the LDS church on April 12, 2005.

Neither is there any evidence that Ausmus' alleged actions were part of a widespread State policy such that the continuing violation theory would apply to extend the statute of limitations beyond April 12, 2005. Plaintiff has submitted several Affidavits relevant to the Court's consideration of whether there existed a State policy of denying

**MEMORANDUM DECISION AND ORDER - 15**

Violent Sexual Predators' First Amendment right to practice their chosen religion. The Affidavit of Mike Trent, Pastor of the Word of Life Church, states that Defendant Ausmus placed "unnecessary restrictions" on another parolee, Dwight Peters, "by not allowing him to attend my services" and that Peters had "numerous problems" with Ausmus' supervision of him. (Dkt. 79-1, ¶¶ 5-6.) When Pastor Trent complained to Ausmus' supervisor, Senior PPO Moira Lynch and another State colleague came to Pastor Trent's home to discuss the issue.

> Pastor Trent declares that the following took place at the meeting:
>
>> Another big issue that I discussed with Ms. Lynch and her associate was concerning the problem of getting approvals for sex offenders attending church services at Word of Life. Ms. Lynch responded to me that she was aware of my unique ministries to parolees and their families, but she also informed me that church attendance for sex offenders was considered a privilege and thus the right had to be earned by the parolee. On the average, it now takes six months to a year before sex offenders are allowed to attend our services.
>>
>> In fact, I have one sex offender parolee now that has exemplary behavior, [who] has been out two years and has still not been approved for Wednesday night services.

*(Id.*, ¶¶ 11-12.)

Ms. Lynch would not discuss Plaintiff's situation with Pastor Trent. (*Id.*, ¶ 13.) Pastor Trent opined: "My greatest concern with Bill [Plaintiff] and any other sex offender parolee is that a parole officer would take it upon themselves to dictate, as Brenda Ausmus did, what denomination/church a parolee must attend or to be approved to attend." (*Id.*, ¶ 15.)

The joint Affidavit of Dwight and Karoline Peters does *not* allege that Ausmus violated their First Amendment religious rights. (Dkt. 67-3.) The Peters' Affidavit complains of Ausmus' generally rude and unsupportive attitude and behavior in her supervision of Dwight Peters, and it also declares in a vague manner:

> It is our understanding that the old mentality of PO's has changed and a PO should be supportive with their main job focus to facilitate an inmate's transition back into society (employment, community, family). They are not to be a stumbling block but a stepping stone as an inmate has already done their time. Per PO Laskey and Bassett "Pre-Release Meetings" 2006 SICI.

(Dkt. 67-3.)

The Court concludes that these Affidavits do not show the existence of a widespread State policy or practice to deny sex offenders the right to practice the religion of their choice or to require them to attend a church not of their choice. Rather, the policy is that no sex offender can attend any church without going through the addendum process. That it is a difficult process for all sex offender parolees to obtain State permission to attend church services does not show that the State had a wide-spread practice or policy of dictating which denominations a parolee could attend. Pastor Trent's Affidavit addresses the difficulty of the entire process for all parolees, but, as to any alleged discriminatory actions, it pinpoints only Ausmus, not multiple parole officers.

The Peters' Affidavit does not provide any specific instances of religious discrimination by Ausmus or any parole officer. Their allegation is that current officers other than Ausmus have abandoned the "old mentality" and are generally supportive; this

**MEMORANDUM DECISION AND ORDER - 17**

allegation does not show a current widespread practice or policy of *religious* discrimination, but shows that Ausmus' generally unsupportive actions are unlike the actions of other parole officers.

## 4. Conclusion

Based on all of the foregoing, the Court concludes that Defendant Ausmus has met her burden of proof to show that Plaintiff did not file his Complaint within two years of the date of her alleged discriminatory acts. Rather, Plaintiff has alleged that he continued to suffer harm from Defendant's denial of the Baptist addendum in August 2004 and April 2005. Equitable tolling or equitable estoppel does not apply. Therefore, Plaintiff's claims are time-barred, and the Court need not consider the parties' other arguments. Defendant is entitled to summary judgment, and Plaintiff's Complaint will be dismissed with prejudice.

The Court will deny Defendant's Motions to Strike various filings of Plaintiff, given that Plaintiff is acting pro se. The Court has considered and liberally construed all of Plaintiff's filings. The other motions are deemed moot, given that they are not relevant to the statute of limitations issue.

## ORDER

**IT IS ORDERED:**

1. Defendant's Motion for Summary Judgment (Docket No. 54) is GRANTED. Plaintiff's Complaint is DISMISSED with prejudice.

2. Plaintiff's Motion for Order to Show Cause re: Contempt (Docket No. 53) is DENIED as MOOT.

3. Plaintiff's Motion for Entry of Contempt (Docket No. 59) is DENIED as MOOT.

4. Defendant's Motion to Strike Affidavit of William Lightner (Docket No. 62) is DENIED.

5. Defendant's Motion to Strike Affidavit of Marcia Lightner (Docket No. 63) is DENIED.

6. Plaintiff's Motion for Extension of Time to File Response to Motion to Strike (Docket No. 65) is GRANTED.

7. Defendant's Motion to Strike Plaintiff's Response (Docket No. 68) is DENIED.

8. Defendant's Motion to Strike Affidavits of Mike Trent and Dwight Peters and Exhibits (Docket No. 69) is DENIED.

9. Defendant's Motion to Strike Plaintiff's Declaration (Docket No. 74) is DENIED.

10. Defendant's Motion for Order Prohibiting Plaintiff from Seeking to Augment Summary Judgment Record (Docket No. 75) is DENIED.

DATED: **August 17, 2010**

Honorable Edward J. Lodge
U. S. District Judge